**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 07-cv-01923-CMA-CBS

SAM GELFAND,

      Plaintiff,

v.

CHERRY CREEK SCHOOL DISTRICT, a corporate entity, and
SHEILA GRAHAM, in her individual and official capacity,

      Defendants.

---

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

---

This is a case about retaliation in the work place. Plaintiff Sam Gelfand ("Plaintiff") alleges that Defendants Cherry Creek School District ("CCSD") and Sheila Graham ("Graham") (collectively "Defendants") unlawfully retaliated against him in violation of the First Amendment of the United States Constitution and a Colorado whistle-blower statute. This matter is before the Court on Defendants' Motion for Summary Judgment and supporting briefs (Doc. ## 35-37), Plaintiff's responses (Doc. ## 38, 42), and Defendants' replies (Doc. ## 41, 43). Jurisdiction is proper pursuant to 28 U.S.C. § 1331 (federal question).

## I. BACKGROUND

### A.    Facts

Because of the procedural posture, the Court views the facts in the light most favorable to Plaintiff. Thus, reasonable inferences are drawn and factual ambiguities are resolved in his favor. In order to maintain the anonymity of the student whose story

is at the heart of this case, the Court refers to her simply as "Student."  With those qualifications in mind, the following facts are undisputed unless otherwise noted.

### The Student Incident

On April 12, 2006, Plaintiff was employed as a paraprofessional in the Interactive Learning Center ("ILC") at West Middle School ("West"), which is part of CCSD.  On that day, Plaintiff's colleague and fellow paraprofessional Sharon Jouy ("Jouy") was assisting Student, a special needs student, with a routine diaper change in the ILC.  (Doc. # 1, ¶ 5; Doc # 38, Ex. 1 at 50:20-51:7.)

During this diaper change, Jouy observed some bleeding coming from Student's vagina.  Noting Student's torn labia, Jouy believed Student had been sexually assaulted.  (*Id.*, Ex. 1 at 44:2-20.)  Jouy notified Sherry Newell ("Newell"), another paraprofessional, and Jenny Giannola ("Giannola"), Plaintiff's supervisor of her observations relating to Student ("Student Incident").  (Doc # 38, Ex. 1 at 55-56, Ex. 2 at 193.)  Plaintiff, also observing Student, concluded that someone had hurt Student in a sexual manner.  (*Id.*, Ex. 2 at 191:17-24.)  Student was taken to Graham, the school principal, and then sent home on a bus.  (*Id.* at 198:24-25, 200:8-12, 210:1-8; Doc # 1, ¶ 12.)

Later that same day, Giannola advised the paraprofessionals, including Plaintiff, that Social Services had been contacted.  (Doc. # 38, Ex. 2 at 221:22-222:11.)  She also told the paraprofessionals to keep the situation confidential.  (*Id.* at 222:16-18.)  Graham's secretary, Amy, also informed the paraprofessionals, including Plaintiff, that

Social Services had been contacted and that proper protocols were followed.  She also instructed Plaintiff and the others to keep the situation confidential.  (*Id.* at 224:2-7.)

With respect to reporting of suspected child abuse, on December 10, 2003, CCSD implemented its Reporting Child Abuse/Child Protection written policy ("Child Protection Policy").  (See Doc. # 37, Ex. C.)  The stated goal of the Child Protection Policy was to ensure that CCSD complied with Colorado's Child Protection Act.  (*Id.* at 1, ¶ 1.)  The Child Protection Policy provides that an employee who has reasonable cause to suspect child abuse should immediately report the situation to the building administrator and "call the Arapahoe County Department of Social Services or, after 4:30 p.m., the Arapahoe County Sheriff."  (*Id.* at 2, ¶ 1.)  Plaintiff admits that he thought his duties in this respect were limited to reporting suspected child abuse to Social Services or a teacher, not necessarily law enforcement.  (Doc. # 38, Ex. 2 at 86:22-87:6; 239:12-241:23.)

The Child Protection Policy also provides that "reports of child abuse . . . shall be confidential and shall not be public information." (Doc. # 37, Ex. C at 1, ¶ 3.)  In this same respect, Plaintiff, who received training regarding the Family Educational Rights and Privacy Act ("FERPA"), a federal statute regarding the privacy of student records, understood that student records and confidentiality were important.  (Doc. # 38, Ex. 2 at 14:25-15:7.)  Furthermore, Plaintiff's Para-Educator job description lists, as one of his duties, that he is to "maintain confidentiality of students' information and records." (Doc. # 52, Ex. 1.)

Despite knowing that Social Services had been contacted in accordance with the Child Protection Policy, Plaintiff was unhappy with the ensuing investigation and with

the way things were handled.  (Doc. # 38, Ex. 2 at 219:24-220:2; 221:12-14.) In particular, Plaintiff was concerned that no para-educators had been interviewed by either Social Services or law enforcement about the Student Incident. (*Id.* at 219:14-23.) Plaintiff was concerned for Student's safety and believed the investigation would have been handled differently if, in addition to Social Services, the police had been contacted. (*Id.* at 216:18-25.)  Plaintiff, however, did not approach Graham with his concerns about the investigation because he was not comfortable discussing the Student Incident with her.  (*Id.* at 227:22-24, 228:18-21, 229:1-8.)

On April 20, 2006, Plaintiff called the police.  Before calling the police, however, Plaintiff spoke with two bus drivers about the Student Incident.  (*Id.* at 105:10-107:19.) Plaintiff acknowledges that he was aware that he had breached Student's confidentiality after speaking with one of the bus drivers.  (*Id.* at 106:12-25-107:3, 224:11-14.)  Plaintiff also discussed the Student Incident with three other employees in the parking lot.  (*Id.* at 218:24-219:23, 225:1-11.)  That was one of several conversations Plaintiff had with other employees regarding the Student Incident.  (*Id.* at 228:1-15.)

On April 20, 2006, prior to his calling the police, Plaintiff was told by Giannola that Student had been examined by a family doctor on April 20 and that the doctor concluded there was no evidence of sexual abuse.  (*Id.* at 276:10-24.)  Instead, the bruising, according to the doctor, was a result of a medical edema.  (*Id.*) Nonetheless, Plaintiff was concerned that potential DNA evidence may have disappeared because too much time had passed between the date of the Student Incident (April 12) and the date of the examination (April 20).  (*Id.* at 277:9-21.)  Although Plaintiff knew this was a private student situation and, thus, subject to confidentiality rules, he proceeded to call

the police to report his concerns about possible child abuse relating to the Student Incident because he did not think reporting his concerns to the police would violate Student's confidentiality rights.  (*Id.* at 223:2-18, 234:4-12.)

### *The Phone Call*

On April 20, 2006, at 9:30 p.m., Plaintiff placed a telephone call to the Greenwood Village Police Department about the Student Incident.  Although the parties dispute Plaintiff's motivations for making the call, the content of the call is readily known because of the existence of a transcript.

Plaintiff relayed to the police dispatcher from the outset that he sought to maintain his anonymity.  (Doc. # 52, Ex. A at 1.)  He repeated his request for anonymity three additional times in the ensuing dialogue, though he did reveal that he worked at West, stating ". . . I work at West Middle School."  (*Id.* at 2.)  Later he affirmed his status as an employee of West:  "I'd love to tell you . . . what is my capacity in the school or what department . . ." and at one point suggested that he ". . . could maybe try to sneak the file from work."  (*Id.* at 7, 8.)  He also explained why he wanted to stay anonymous, ". . . I just can't risk any possible implication that this is unprofessional behavior and so that's why I just can't provide you my name . . . ."  (*Id.* at 8.)

The reason he was calling, he told the dispatcher, was because "[t]here is a very potential sexual abuse case . . . that I feel has been totally (inaudible) mishandled by the School administration."  (*Id.* at 1.)  Regarding protocols, he explained that, "[t]he report we got from the teacher was . . . that she was following all the proper notifications."  (*Id.* at 6.)  Even so, he "felt that the proper procedures were not going to be followed . . . that we reported this incident and that they contacted Social Services

5

. . . ." (*Id.*)  Essentially, his position was " . . . that the proper procedure would be, not only to call social services, you call the police . . . ." (*Id.* at 4.)

With respect to Student's guardians, Plaintiff told the police dispatcher, in part, that "[Student's] mom and dad are in jail and she's being take care of by her sister and we think her sister is like an exotic dancer so she rarely comes to school because, you know, her sister just doesn't, she's out partying all night." (*Id.* at 2.)  Plaintiff admits that he was unsure whether Student's guardian was in fact an exotic dancer, but he and several of his colleagues suspected it was true.  (Doc. # 38, Ex. 2 at 252:1-3, 95:2-9.)

With respect to his observations of Student's injuries, Plaintiff told the police dispatcher, in part, that "she had noticeable bruising (inaudible) private parts." (Doc. # 52, Ex. A at 2.)  It is unclear from the transcript whether Plaintiff was saying that he personally saw the bruising or, rather, that he was told there was bruising.  (*See id.*) He admits later that he never saw bruising on her private parts but did see bruising on her inner thighs. (Doc. # 38, Ex. 2 at 252, 254-55.)

### *The Aftermath*

Plaintiff contends that Graham was dismayed with him for not having contacted her before calling the police.  (*Id.* at 257:16-19.)  On April 22, 2006, Plaintiff received a two-page reprimand letter from Graham.  In it she states that "[t]his is a formal letter of reprimand addressing your non-adherence to issues of confidentiality, false reporting to an official agency, and reported verbal harassment by fellow employees." (Doc. # 37, Ex. D.)  She then enumerates seven incidents occurring between April 3 and April 21, 2006, six of which relate to the Student Incident.  (*Id.*)

In particular, Graham reprimanded Plaintiff for disobeying Giannola's directive to maintain Student's confidentiality right and to not discuss the Student Incident. Further, Graham admonished Plaintiff for reporting what she described as incorrect and confidential information to the police regarding Student's family.  (*Id.)*

Graham concludes the letter by ordering that Plaintiff follow five directives. In essence, they instruct Plaintiff to "maintain the confidentiality of all students" and to behave professionally.  (*Id.*)

Plaintiff's paraprofessional contract was reviewed on a yearly basis, and CCSD had the option of non-renewal.  (Doc. # 37, Ex. G, ¶ 4.)  Fewer students were to be enrolled in the ILC for the 2006-2007 school year, a fact Plaintiff learned from Giannola. (Doc. # 38, Ex. 2 at 274:21-275:8.)  On May 22, 2006, Plaintiff received an evaluation from CCSD that graded his performance "below average."  At the end of the school year, Plaintiff was informed that his services would no longer be needed by CCSD. (Doc # 1 at 4-5.)

## B.    Procedural History

Plaintiff filed a complaint (Doc. # 1) on September 12, 2007, alleging that Defendants Cherry Creek School District and Sheila Graham unlawfully retaliated against him in violation of the First Amendment and C.R.S. § 24-50.5-103.  Defendants answered on November 13, 2007 (Doc. # 8).

Almost a year later, on October 30, 2008, Defendants moved for summary judgment.  (Doc. # 35.)  They filed an amended brief in support of their motion on

November 4, 2008.  (Doc. # 37.)  Plaintiff filed a response on November 17, 2008 (Doc. # 38.), to which Defendants replied on December 9, 2008.  (Doc. # 41.)

Finally, Plaintiff filed a supplement to his response on December 30, 2008, to account for the Tenth Circuit's issuance of *Thomas v. City of Blanchard*, published on December 3, 2008.  (Doc. # 42.)  Defendants duly replied to the supplement on January 13, 2009. (Doc. # 43.)

## II.  STANDARD OF REVIEW

The purpose of a summary judgment motion is to assess whether trial is necessary.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Fed.R.Civ.P. 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party, *Allen v. Minnstar, Inc.*, 8 F.3d 1470, 1476 (10th Cir. 1993), and any factual ambiguities must be resolved in favor of the nonmovant, thus favoring the right to a trial.  *Houston v. Nat'l General Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing

*Celotex*, 477 U.S. at 323).  The "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the [C]ourt a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Id.* at 671.  After the movant has met its initial burden, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of the claim such that a reasonable jury could find in its favor.  *See Anderson*, 277 U.S. at 248; *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).  The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which, as mentioned, the Court views in the light most favorable to the nonmovant.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324).  However, conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence.  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

With respect to the first claim alleging First Amendment retaliation, the traditional Rule 56 analysis takes on a different tenor.  As discussed below, there are five questions to evaluate.  The first three are questions of law to be decided by the Court.  Thus, although there may be "genuine issues of material fact" with respect to the first three questions, they are for the Court, not the jury, to resolve.

### III.  ANALYSIS

The Court begins with the First Amendment claim then discusses the state whistle-blower claim.

**A.      Section 1983 Freedom of Speech Retaliation Claim – Garcetti/Pickering Test**

Plaintiff alleges that Defendants unlawfully dismissed him in retaliation for exercising his First Amendment right to free speech in violation of 42 U.S.C. § 1983. To prevail on his claim, Plaintiff must establish that there was a deprivation of a federal or constitutional right by a person acting under color of state law.  *See* 42 U.S.C. § 1983; *Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir. 2001).

This case hinges on the first step of Plaintiff's 1983 claim, that is, whether Plaintiff has adequately established a deprivation of a federal or constitutional right. Here, the "deprivation" is Defendants' alleged retaliatory non-renewal in violation of the First Amendment.

In analyzing Plaintiff's First Amendment retaliation claim, the Court applies the five-prong test established by the United States Supreme Court in *Garcetti v. Ceballos*, 547 U.S. 410 (2006) (hereinafter referred to as the "*Garcetti/Pickering* test").  The first three of these prongs involve questions of law to be decided by the Court, while the final two involve questions of fact, normally reserved for the jury.  *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1203 (10th Cir. 2007).

Thus, to decide Defendants' Motion for Summary Judgment, the Court must first determine whether Plaintiff spoke pursuant to his official duties or whether he spoke as a citizen.  If Plaintiff spoke pursuant to his official duties, there is no constitutional protection and the inquiry ends.  If, however, Plaintiff spoke as a citizen, the analysis proceeds to step two, wherein the Court must determine whether the subject of the speech is a matter of public concern.  Third, if Plaintiff speaks as a citizen on a matter

of public concern, the Court must determine whether Plaintiff's interest in commenting on the issue outweighs the interest of the state as employer.  Fourth, assuming Plaintiff's interest outweighs the interest of the state as employer, Plaintiff must show that his speech was a substantial factor or a motivating factor in a detrimental employment decision.  Finally, if Plaintiff establishes that his speech was such a factor, the employer may still avoid liability if it demonstrates that it would have taken the same action even in the absence of the protected speech.  *Id.* at 1202.

### 1.   Did Plaintiff Speak as a "Citizen" or "Pursuant To His Official Duties"?

The first prong of the *Garcetti/Pickering* test asks whether Plaintiff's speech was spoken pursuant to his official duties.  *See Garcetti v Ceballos*, 547 U.S. 410, 413, 421 (2006).  In several opinions issued after *Garcetti,* the Tenth Circuit has refined the distinction between speaking pursuant to official duties and speaking as a citizen. As discussed below, the Tenth Circuit has taken a "broad" view of this first prong. *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008).  The Court begins by discussing the principles announced by the *Garcetti* Court, then proceeds to a survey of recent Tenth Circuit decisions in which those principles were applied.

The United States Supreme Court decided *Garcetti v. Ceballos* in May of 2006. The Court, in an opinion written by Justice Kennedy, split in two what was once a single inquiry: whether an employee speaks as a citizen on a matter of public concern. *Garcetti*, 547 U.S. at 418 (discussing test as laid out in *Pickering v. Board of Ed. Of Township High School Dist. 205 Will City.*, 391 U.S. 563 (1968)).  Focusing on the first part of that phrase, whether an employee speaks as a citizen, Justice Kennedy

11

explained the reasoning behind the inquiry as follows:  "A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations."  *Id*.  Thus, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom."  *Id*.  This, however, does not mean that all speech by a public employee is unprotected.  "The First Amendment protects some expressions related to the speaker's job."  *Id*. at 421.  The controlling factor is whether the speech was made "pursuant to [the Plaintiff's] duties."  *Id*.  If so, it is not protected speech, because "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or created."  *Id*. at 421-22.

Even in dissent, Justice Souter, joined by Justices Stevens and Ginsburg, echoed the same theme:  "T]he reason the protection of employee speech is qualified is that it can distract co-workers and supervisors from their tasks at hand and thwart the implementation of legitimate policy."  *Id*. at 429.

The Court begins the review of Tenth Circuit precedent with *Green v. Bd. of County Commr's*, 472 F.3d 794, 801 (10th Cir. 2007), in which the Tenth Circuit stated that "speech is made pursuant to official duties if it is generally consistent with the type of activities the employee was paid to do."  *Id*.  The Court in *Green* held that a drug-lab technician spoke pursuant to her official duties, and not as a citizen, when she reported concerns regarding a testing policy to her supervisor, the manufacturer of testing

equipment, and others.  *Id.* at 800.  The court emphasized that her communications were attributable to her employer and that "[a] government employee's First Amendment Rights do not invest them with a right to perform their jobs however they see fit."  *Id.* at 801.

The Tenth Circuit revisited this test in *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1202 (10th Cir. 2007), stating that "speech may be made **pursuant** to an employee's official duties even if it deals with activities that the employee is not expressly required to perform."  (Emphasis added).  Evoking the Supreme Court in *Garcetti*, the court stressed that the proper inquiry is a practical one: "We must take a practical view of all the facts and circumstances surrounding the speech and the employment relationship."  *Brammer-Hoelter*, 492 F.3d at 1204. *Brammer-Hoelter*, evidences the application of a more expansive definition of the term "pursuant."

The Tenth Circuit's most recent opinion discussing the first prong of the *Garcetti/Pickering* test is *Thomas v. City of Blanchard*, 548 F.3d 1317 (10th Cir. 2008). In *Blanchard*, the plaintiff, a building code inspector who was terminated, sued the city of Blanchard and several of its employees alleging retaliation for exercise of his First Amendment right to report certain information to the Oklahoma State Bureau of Investigation ("OSBI") and his threat to make that report.  The Tenth Circuit reversed the district court's grant of summary judgment for Defendants, holding that the plaintiff's speech was not made pursuant to his official duties; rather, it was made in his role as citizen.  In reaching this decision, the Tenth Circuit considered the plaintiff's job duties,

including the Defendants' concession that those duties did not include a duty to contact the OSBI for perceived criminal violations.  The Court reasoned that "[the plaintiff] went well beyond his official responsibilities" in calling the OSBI to report suspected fraud.  *Id.* at 1324.  As the Court discusses below, the same cannot be said for Plaintiff in the instant case.

The Court's first task is identifying "the speech which resulted in the alleged retaliation."  *Deschenie v. Board of Education of Central Consolidated School Dist. No. 22*, 473 F.3d 1271, 1276 (10th Cir. 2007) (internal quotations and citations omitted). The parties agree that the at-issue "speech" is the telephone call Plaintiff made to the Greenwood Village Police Department on April 20, 2006.

Plaintiff claims that his call to the police to report his concerns regarding the Student Incident was protected because he spoke as a citizen rather than pursuant to his official duties.  Defendants argue that summary judgment is warranted because Plaintiff made the call "pursuant" to his role as a paraprofessional and, thus, the speech was unprotected.  The Court agrees with Defendants.

Plaintiff advances several arguments.  First, he argues that, although he identified himself to the dispatcher as a West employee, he expressly sought to maintain his anonymity throughout the conversation.  Thus, he asserts that the call was not an "official" communication from the school and not made "pursuant to his official duties."  A closer look at the context, however, reveals otherwise.  Although he sought to maintain his anonymity, Plaintiff relied on his status as a West employee to lend credibility to his statements, a fact suggesting he spoke in his professional capacity. *See Brammer-Hoelter*, 492 F.3d at 1203.  Further, Plaintiff acknowledged to the

14

dispatcher that the reason for maintaining his anonymity was that he feared what he was doing was unprofessional employee conduct for which he could be disciplined.

Although Plaintiff admits that his duties did include reporting child abuse, Plaintiff argues that his duties did not include **calling the police** regarding suspected child abuse.  Rather, he argues that his duty was limited to reporting abuse to Social Services, not the police.  The Child Protection Policy suggests otherwise, stating that employees, including Plaintiff, had a duty to report incidents of suspected child abuse to the law enforcement officials, for reports made after 4:30 p.m.  Plaintiff's call was made at 9:30 p.m.  However, distinguishing between reporting to Social Services or law enforcement and giving significant weight to the timing of a phone call seems overly technical.  Thus, the Court does not find the timing of the call to be dispositive.  In order to rest its conclusions on a more "practical" analysis, as it must, the Court considers "all the facts and circumstances surrounding the speech and employment relationship," not just the timing of the at-issue speech.  *See Brammer-Hoelter*, 492 F.3d at 1204,

One of the facts highlighted by Plaintiff is his state of mind before and during the call.  He argues that because he was unsure what his duties were and because he "felt" that he was making the call as a citizen, the Court should decide this prong in his favor.  However, Plaintiff's beliefs about the scope of his duties, if relevant at all, are only marginally relevant.  In the instant case, Plaintiff admits that knew he had a duty to report suspected incidents of child abuse pursuant to the protocol established by the Child Protection Policy and the Tenth Circuit has eschewed a rigid analysis in defining the scope of a given employee's duties.  So long as the speech concerns a matter

within the employee's "portfolio" it is made "pursuant to [his] official duties." *Brammer-Hoelter*, 492 F.3d at 1203 (quoting *Casey*, 473 F.3d at 1329).

The Court also considers Plaintiff's job description.  The job description lays out, in general terms, Plaintiff's job duties.  Although nothing in the job description itself suggests that Plaintiff had a duty to report child abuse, "[a]n employee's official job description is not dispositive." *Brammer-Hoelter*, 492 F.3d at 1203.  Given the practical view the Court takes in evaluating this prong, the job description and Child Protection Policy are only two components to consider and neither is dispositive, especially in light of Plaintiff's admission that his duties did include reporting suspected incidents of child abuse.

As to this prong, the Court holds that, given "all the facts and circumstances surrounding the speech and employment relationship," when Plaintiff made the phone call to the police, Plaintiff was not speaking as a citizen; rather Plaintiff's call to the police in this case was made as a public employee pursuant to his official duties.  The content of the call "owes its existence" to his role as a paraprofessional.  That is, but for Plaintiff's position as a para-educator, he would not have been privy to the confidential student information he shared with police.

Although this conclusion of law, in and of itself, is sufficient to resolve the motion for summary judgment in favor of Defendants, the Court proceeds with the analysis of steps two and three to demonstrate that the same outcome would result even if Plaintiff were to have prevailed at this step, i.e., that Plaintiff had spoken as a citizen.

### 2.    Did Plaintiff's Speech Touch On a Matter of Public Concern?

At step two, the Court is charged with deciding "whether the speech at issue touches on a matter of public concern."  *See Casey v. West Las Vegas Indep. Dist.*, 473 F.3d 1323, 1327 (10th Cir. 2007) (citing *Dill v. City of Edmond*, 155 F.3d 1193, 1201 (10th Cir. 1998)).  A matter of public concern is one which is of interest to the community, whether for social, political, or other reasons.  *Dill*, 155 F.3d at 1202. "Matters solely of interest to a government employee . . . are not protected by the First Amendment." *Id.*  Consequently, "speech related to internal personnel disputes ordinarily does not involve public concern" whereas "speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of . . . officials . . . clearly concerns matters of public import." *Id.* (quotation omitted).

Whether a given statement is a matter of public concern is a question of law to be determined by the Court.  *See Brammer-Hoelter*, 492 F.3d at 1205; *Hulen v. Yates*, 322 F.3d 1229, 1237 (10th Cir. 2003).  In making this determination, the Court must consider the "content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 103 U.S. 1684, 1690 (1983); *Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir. 1996).  The Court should also consider the speaker's motive, asking whether the speech was calculated to redress a personal grievance or if it had a broader public purpose.  *Gardetto*, 100 F.3d at 812.

In the instant case, Plaintiff called the Greenwood City Police Department to report suspected child abuse.  Defendants maintain that, because a doctor had examined Student and determined no sexual abuse had occurred, Plaintiff could not have been reporting on a suspected child abuse.  Defendants' argument is not

persuasive.  A given doctor's opinion as to whether abuse occurred or not is not relevant to deciding whether the at-issue speech – a phone call alerting authorities of suspected child abuse – touches on a matter of public concern.  In other words, this doctor's opinion does not diminish, in any way, the general notion that suspected child abuse is a matter of public concern.

Moreover, Plaintiff was not calling to address a personal grievance, *Gardetto*, 100 F.3d at 812, nor an internal personnel dispute, *Dill*, 155 F.3d at 1202.  As evidenced by Defendants' own actions with respect to the Student Incident and its adoption of the Child Protection Policy, suspected child abuse is not a matter of interest solely to Plaintiff.  To the contrary, the subject of Plaintiff's call – suspected child abuse – encompasses a broader public purpose.  *See Bunger v. Univ. of Okla.*, 95 F.3d 987, 992 (10th Cir. 1996); *Gardetto*, 100 F.3d at 812.  If there remains any doubt, the fact that both the state and federal government have adopted legislation addressing issues of child abuse makes clear that it is a matter of interest to the community and, thus, a matter of public concern.  *See* 20 U.S.C. § 1232(g); C.R.S. § 19-3-304.  The Court holds that the subject matter of Plaintiff's speech, a suspected incident of child abuse, is a matter of public concern.

### 3.     *Does Plaintiff's Interest In Commenting On the Issue Outweigh the Interest of the State As Employer?*

If Plaintiff speaks as a citizen on a matter of public concern, the Court must determine whether Plaintiff's interest in commenting on the issue outweighs the interest of the state, as employer, in restricting such speech.  *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1304 (10th Cir. 2009) (internal quotations and citations omitted).

Though this prong is often phrased in terms of a balancing test, the Tenth Circuit has stated that "First Amendment rights are protected unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee." *Id.* (internal quotation marks and citations omitted). "In other words, unless the government can show that the termination was based on legitimate reasons grounded in the efficient conduct of public business, there is no need to proceed to balancing, and the First Amendment interest of the plaintiff prevails." *Id.* If, however, the Court moves past the initial efficiency considerations and onto the balancing test, the Tenth Circuit has instructed that "a court should generally consider whether the speech impairs discipline, has a detrimental impact on close working relationships, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* (citing *Gardetto*, 100 F.3d at 815). "[T]he employer cannot rely on purely speculative allegations that certain statements caused or will cause disruption." *Id.* (internal citations omitted).

In the instant case, Plaintiff had a statutory duty, under both state and federal law, to protect the confidentiality of student information. He also had a duty to protect the confidentiality of students pursuant to school policies and practices. Plaintiff does not deny that he knew that he had such a duty. Instead, he attempts to minimize this duty by highlighting case law in which the plaintiff's statutory duties were either overly broad, *Thomas,* 548 F.3d at 1325 (court found that statute potentially imposing criminal liability on every public official not part of plaintiff's job description), or otherwise made insignificant by competing facts. *See Casey*, 473 F.3d at 1330 (plaintiff's liability limited dependent on whether she was "primarily responsible" for administering government

19

program).  These cases are inapposite to the instant case.  Though it is true that Plaintiff was not "primarily responsible" for reporting suspected child abuse, the relevant confidentiality and privacy laws apply across the board to all school employees.

These duties stem from federal and state law.  Under FERPA, both Defendants and Plaintiff had a duty under federal law to protect the privacy of Student's records and information.  20 U.S.C. § 1232(g).  Under the Child Protection Act of 1987, both Defendants and Plaintiff had a duty under Colorado law not only to report child abuse but to protect the confidentiality of those students suspected of being abused.  Colorado Revised Statute, section 19-1-307 is instructive: "reports of child abuse or neglect and the name and address of any child, family, or informant or any other identifying information contained in such reports shall be *confidential* and shall not be public information." C.R.S. § 19-1-307.  This provision is subject to a good cause exception, but that exception only applies if authorized by a court.  Plaintiff's behavior in this case was arguably criminal, as the statute makes clear.  "Any person who violates any provision of this subsection (1) is guilty of a class 2 petty offense . . ." C.R.S. § 19-1-307.  The statute also provides for civil penalties.  "Any person who knowingly violates the confidentiality provisions of this section shall be subject to a civil penalty of up to one thousand dollars." C.R.S. §19-1-303(4.7).  These statutory duties were also embodied in CCSD's Child Protection Policy.  Moreover, Plaintiff admitted he received training regarding his statutory duties and acknowledged, during his deposition, that he had breached Student's confidentiality.  Defendants had legitimate reasons for restricting speech related to the Student Incident, *i.e.*, to protect student confidentiality.

Plaintiff was inherently limited in what he could discuss due to the confidentiality issues involved in this case.  Thus, the question becomes whether Plaintiff's interest in reporting the Student Incident outweighs Defendants' interest in protecting the Student's confidentiality?  This is a question of law for the Court, and the facts of this case compel an answer which comes easily:  No.  Protecting Student's confidentiality was part of Plaintiff's job and Plaintiff was subject to his employer's authority to restrict speech related to confidential student information.  *See Thomas,* 548 F.3d at 1324. Defendants' interest in protecting the confidentiality of Student outweighs Plaintiff's interest in reporting the Student Incident to the police, particularly because Defendants had appropriately reported the Student Incident in accordance with the Child Protection Policy.  Thus, the Court holds that the Plaintiff's interests are outweighed by Defendants' interests.

In sum, Defendants' Motion for Summary Judgment is granted with respect to Plaintiff's First Amendment Claim because Plaintiff's claim fails as a matter of law at steps one and three of the *Garcetti/Pickering* test.

## C.     Whistleblower Claim

In addition to his Section 1983 claim, Plaintiff asserts a state-law claim under C.R.S. § 24-50.5-103, alleging he was non-renewed in retaliation for engaging in protected activity.  A district court which has dismissed all claims over which it had original jurisdiction may decline to exercise supplemental jurisdiction over the remaining state-law claims. 28 U.S.C. § 1367(c)(3); *Howard v. Jaramillo*, Slip Copy 2008 WL 5381469 at *9 (D. Colo. December 22, 2008).  Pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966), the decision regarding whether the Federal

court should exercise jurisdiction over purely state law claims rests in the sound discretion of the district court. *See also Estate of Harshman v. Jackson Hole Mountain Resort Corp.*, 370 F.3d 1161, 1165 (10th Cir. 2004). Moreover, the Tenth Circuit has indicated that if federal claims are dismissed before trial, as in the instant case, leaving only issues of state law, the Court should decline to exercise jurisdiction over the state claims. *Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1264 (10th Cir. 2003).

Given the fate of Plaintiff's lone federal claim, the Court declines to exercise jurisdiction over his pendent state-law claim. Thus, the Court dismisses Plaintiff's state whistle-blower claim.

## IV.  CONCLUSION

Based on the foregoing, the Court ORDERS that Defendants' Motion for Summary Judgment (Doc. # 35) is GRANTED. Accordingly, this case is DISMISSED WITH PREJUDICE, and the Clerk of the Court shall enter judgment in favor of Defendants and against Plaintiff. Pursuant to D.C.Colo.LCivR 54.1, Defendants may thereafter have their costs by filing a bill of costs within ten (10) days of the date of that order.

IT IS FURTER ORDERED that the final trial preparation conference set for June 12, 2009 and the five-day jury trial set to commence on July 6, 2009 are VACATED.

DATED:  June __10__, 2009

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge